Jack **GRANT** et al., Appellants,

v.

**UNITED GAS PIPE LINE COMPANY,**
Appellee.

No. 520.

Court of Civil Appeals of Texas,
Corpus Christi.

May 20, 1970.

Rehearing Denied Aug. 28, 1970.

Luther E. Jones, Jr., Corpus Christi, for appellants.

Vinson, Elkins, Searls & Connally, Ewing Werlein, Jr., Houston, for appellee.

## OPINION

SHARPE, Justice.

This appeal is from a judgment rendered in a condemnation suit by the County Court at Law No. II of Nueces County, Texas based upon an instructed verdict in favor of appellee-condemnor and against appellants-condemnees. The interest sought to be condemned was an easement 50 feet in width for a gas pipe line across a 280 acre tract of land owned by appellants located on Mustang Island in Nueces County, Texas. The judgment granted appellee the easement sought, covering 3.45 acres, and awarded appellants nominal damages in the amount of $1.00.

Appellee instituted these proceedings by filing its original statement with the county judge of Nueces County, Texas, who appointed special commissioners. After hearing, the commissioners entered an award of $4,050.00 covering the value of the rights of way and damages to the remainder. Appellants filed objections to the award with the county clerk, and appellee filed objections with the county clerk and county judge. The county clerk docketed the case in County Court at Law No. II, Nueces County, where it was tried.

Appellants assert three points of error in substance that: (1) The judgment and the commissioners' award which preceded it are both void for want of jurisdiction, (2) in any event, the trial court erred in granting appellee's motion for instructed verdict, particularly fixing appellants' damages at $1.00, and (3) the trial court erred in ordering that the clerk return to appellee $4,049.00 (out of $4,050.00) deposited by appellee when it took possession.

We have concluded that appellants' point one should be overruled and their points two and three sustained. Otherwise stated, we hold that the trial court had juris-

diction of the proceedings but erred in instructing a verdict for nominal damages and in rendering judgment awarding appellants only $1.00 as their compensation.

■ Appellants' primary contention under their point one is that the County Court at Law No. II of Nueces County does not have eminent domain jurisdiction, since there are no statutes vesting that court with such jurisdiction. In order to pass upon that contention we must consider the following statutes: Acts 1949, 51st Legislature, Regular Session, Ch. 362, pp. 692–696, known as Art. 1970–339, Vernon's Ann.Civ. St., which created the County Court at Law of Nueces County, Texas; Acts 1954, 53rd Legislature, First Called Session, Ch. 14, pp. 42–47, known as Art. 1970–339A, V.A. C.S., which created County Court at Law No. II of Nueces County and renamed the County Court at Law as County Court at Law No. I of Nueces County; Acts 1967, 60th Legislature, Regular Session, Ch. 200, pp. 435–440, V.A.C.S., which, among other things, amended the above mentioned 1949 and 1954 Statutes known as Articles 1970–339 and 1970–339A, V.A.C.S. Under the 1949 and 1954 statutes neither County Court at Law No. I or II of Nueces County had jurisdiction in eminent domain cases, the same being reserved to the County Court. The parties agree that under the 1967 statute eminent domain jurisdiction was conferred for the first time on County Court I. However, they disagree concerning whether the 1967 statute conferred eminent domain jurisdiction on County Court II. Appellants contend that such jurisdiction was not conferred on County Court II and appellee says that it was. We agree with appellee on this point.

Appellants argue that County Court II does not have eminent domain jurisdiction because the 1954 statute which created that court, in Section 3, Art. 1970–339A, V.A. C.S., provided in part as follows:

"Sec. 3. The County Court at Law No. 2 of Nueces County shall have and exercise jurisdiction in the matters and causes, civil and criminal, original and appellate, over which the County Court at Law No. 1 of Nueces County has jurisdiction according to the provisions of Sections 2 and 3 of Acts, 1949, Fifty-first Legislature, page 692, Chapter 362, known and cited as Article 1970–339, Vernon's Annotated Civil Statutes of the State of Texas * * *";

and that under the 1949 Act (creating the County Court at Law of Nueces County) and Sections 2 and 3 of that Act, the County Court at Law of Nueces County did not have eminent domain jurisdiction at that time, the same having been reserved to the County Court of Nueces County; and that the 1967 statute in the body thereof did not amend or change the 1954 Act so as to enlarge the jurisdiction of County Court II to include eminent domain cases.

The title or caption of the 1967 amendments provides in part as follows:

"An Act—enlarging the authority and jurisdiction of both the County Court at Law No. I of Nueces County, Texas, and the County Court at Law No. II of Nueces County, Texas, to include matter of probate, eminent domain, and lunacy; * * * repealing all laws or parts of laws in conflict herewith; * * *"

The 1967 Act directly confers eminent domain jurisdiction on County Court I, but the body of the Act does not expressly or directly refer to the subject of eminent domain jurisdiction in connection with County Court II. Appellants particularly argue that the above-quoted provisions in the caption or title of the 1967 Act are immaterial because there is nothing in the body of that Act which purports to extend jurisdiction of County Court II to eminent domain matters. Here appellants rely upon the rule stated in Red River Nat. Bank v. Ferguson, 109 Tex. 287, 206 S.W. 923 (1918), that the title of a statute of itself has no enacting force and cannot confer powers not mentioned in the Act. Appellee says that there are several provisions in the body of the 1954 Act as amended by the 1967 Act which

when considered with the caption of the 1967 Act serve to confer eminent domain jurisdiction on County Court II. Appellee points out that the 1954 statute creating County Court II, in the last sentence of Sec. 3 of Art. 1970–339A (immediately following the above-quoted provision of that section) provides as follows:

" * * * Its jurisdiction shall be concurrent with that of the County Court at Law No. 1 of Nueces County, except that each Court shall give priority to cases according to the provisions contained in this Act.";

and that the 1967 amendment does not repeal, alter or modify the provisions of Sec. 3, above set out. Appellee further points to Section 20 of Article 1970–339A, V.A.C.S. (the 1954 Statute) which provides as follows:

"Sec. 20. Each of the judges of said County Courts at Law may, with the consent of the Judge of the Court to which transfer is to be made, transfer any case, action or proceeding from his Court to the other Court by the entry of an order to that effect upon the docket, and the Court to which such case, action or proceeding is transferred shall have full power and authority to hear and determine same in the same manner and with the same legal effect as if said case had been originally docketed in his Court.";

and that the 1967 amendment did not repeal, alter or modify the provisions of Sec. 20, above set out.

It is apparent from a reading and analysis of the 1954 statute (particularly Sec. 3, Art. 1970–339A) that it conferred upon County Court II all the jurisdiction which could then have been exercised by County Court I, that the two courts had concurrent jurisdiction and still do unless the 1967 statute changed the situation. It further appears that under the 1954 statute (particularly Sec. 20, Art. 1970–339A) that County Court II had jurisdiction to hear and determine any case, action or proceed-

ing pending in County Court I upon transfer from that Court to County Court II. Additionally, the 1954 statute (Sec. 21, Art. 1970–339A) provided that each judge of the two courts was authorized to hear and determine cases or proceedings in the other court.

In deciding the question as to whether County Court II had jurisdiction in eminent domain matters and of this case we apply the rule stated in Shipley v..Floydada Independent School District, 250 S.W. 159, 160 (Tex.Com.App., 1923) and reiterated in Schlichting v. Texas State Board of Medical Examiners, 158 Tex. 279, 310 S.W.2d 557, 563 (1958), as follows:

" * * * When a new section has been introduced into a law, it must be construed in view of the original statute as it stands after the amendment is introduced, and it and all the sections of the old law must be regarded as a harmonious whole, all sections mutually acting upon each other."

The several sections of Article 1970–339 and 339A as amended in 1967 can be construed harmoniously as a whole. It is evident from a reading of the 1954 law creating Court No. II, that by Art. 1970–339A the Legislature intended and accomplished the purpose of creating a second County Court at Law for Nueces County which was coequal in jurisdiction with the existing court (originally County Court at Law and renamed County Court at Law No. I). The provision in Art. 1970–339A, Sec. 3, which initially conferred jurisdiction on Court No. II identical to that vested in Court No. I, also provided that the jurisdiction of Court No. II "shall be concurrent" with that of Court No. I. The caption of the 1967 Act clearly announces the intention of the Legislature to enlarge the authority and jurisdiction of both County Court at Law Numbers I and II to include eminent domain cases along with matters of probate and lunacy. Section 2 of Art. 1970–339 was expressly amended by the 1967 Act so as to enlarge the jurisdiction

of County Court I to include matters of eminent domain. Section 3 of Art. 1970–339A (conferring concurrent jurisdiction on County Court II with County Court I) was left unchanged by the 1967 Act. Section 20 of Art. 1970–339A (providing for transfer of cases from one County Court at Law to the other), was also left unchanged by the 1967 amendments. The 1967 Act specifically repealed certain sections of Article 1970–339 and 339A and substituted new sections. When we consider the caption of the 1967 Act, its express enlargement of County Court at Law I jurisdiction to include matters of eminent domain, and that Sections 3 and 20 of Art. 1970–339A (the 1954 Act) were left unchanged, we hold that the 1967 Act accomplished the purpose of enlarging the jurisdiction of County Court at Law II to include eminent domain cases, and that said Court II had jurisdiction of the instant case.

Appellants further contend that even if the 1967 Act vested eminent domain jurisdiction in Court No. II, then the appellee-condemnor could only have validly invoked that jurisdiction by filing its original statement with the judge of that court, and that the record would have to show that one or more of the parties perfected an appeal from the commissioners' award to that court; and that, as hereinabove stated, since the record shows that appellee's original statement was filed with the county judge and that the objections to the award of the commissioners appointed by him were filed by appellee with the county judge and the county clerk, and by appellants with the county clerk, that the jurisdiction of Court II was not invoked. Appellee's reply to such contention is in substance that the preliminary proceedings which preceded the docketing of this case in Court No. II were lawfully conducted under the Ex Officio Authority of the county judge because (1) the preliminary proceedings in eminent domain cases are administrative, not judicial, in character; (2) that administration of the preliminary proceedings in eminent domain cases is one

of the "Ex-Officio Duties" reserved to the county judge of Nueces County by the 1967 Statute; and (3) that the county judge may exercise such administrative functions in eminent domain matters even though, after filing of objections to the commissioners' award, the case is tried in County Court II. We agree with appellee's position on this phase of the case.

█ It is well settled that the filing of the statement in condemnation, the appointment of the commissioners, the filing of the commissioners' award, and the filing of objections to the award of the commissioners in eminent domain proceedings are administrative, and not judicial proceedings. The jurisdiction of the court, as a court, does not attach until the objections to the commissioners' award are "submitted to and determined by the court as a judicial tribunal." Pearson v. State, 159 Tex. 66, 315 S.W.2d 935, 937 (1958). The Supreme Court of Texas in *Pearson* analyzed these preliminary proceedings in the following terms:

> " * * * It thus is clear that the proceeding becomes a civil case if objections are filed within the prescribed period, and either party has the right to appeal from a final judgment thereafter entered by the county court. * * *

> * * * * * *
> " * * * We have said that a statutory proceeding *in which the controversy is not submitted to and determined by the court as a judicial tribunal 'is neither a suit at law nor a case in equity' even though the same culminates in a judgment.* See Fortune v. Killebrew, 86 Tex. 172, 23 S.W. 976, 978. Several of our intermediate courts have also expressed the view that a condemnation proceeding becomes a judicial action only when an appeal is taken from the award of the commissioners. (Authorities omitted) In one case it was pointed out that the timely filing of objections is necessary to remove the proceeding from the effect of the decision of a special tribunal to a

regularly constituted court, but the opinion then concludes by saying that 'the proceedings do not become an action in the county court in the true sense until such objections are filed or until the time for filing same has expired and the judge is required to enter judgment on the award.'" 315 S.W.2d at 937. (emphasis supplied)

The preliminary steps taken before the county judge and the special commissioners are administrative proceedings and are in no sense judicial. Lower Nueces River Water Supply District v. Cartwright, 160 Tex. 239, 328 S.W.2d 752, 754 (1959); State v. Giles, 368 S.W.2d 943 (Tex.Sup. 1963).

■ In our view the 1967 amendments to Articles 1970–339 and 1970–339A, V.A. C.S., reserved to the county judge, apart from the jurisdiction of the County Court of Nueces County, ex officio duties which would include administration of the preliminary proceedings in eminent domain cases.

Article 1970–339, Section 4, as amended, provides in part:

"* * * All ex officio duties of the County Judge shall be exercised and retained by the Judge of the County Court of Nueces County except insofar as same shall by this Act be committed to the County Court at Law No. I of Nueces County."

Article 1970–339A was amended in identical fashion with respect to Court No. II. "Ex officio" means: "From office; by virtue of the office; without any other warrant or appointment than that resulting from the holding of a particular office." Black's Law Dictionary, (4th ed. 1951). The scope of "ex officio" duties, however, is not specified in the statute, and is therefore open to construction in light of the intention of the Legislature, the old law, and the overall purpose of the legislation. See Article 10, V.A.C.S.; Calvert v. Kadane, 427 S.W.2d 605, 608 (Tex.Sup.1968).

The construction of "ex officio duties" of the County Judge to encompass the administration of all preliminary proceedings in eminent domain is supported by the general statutes governing eminent domain proceedings. See City of El Paso v. Ward, 213 S.W.2d 726, 728 (Tex.Civ.App.—El Paso 1948, no writ), wherein the function of the County Judge over the preliminary proceedings in eminent domain was referred to as a "purely ministerial duty". The general statutes governing eminent domain proceedings vest in the County Judge authority over all the preliminary or administrative proceedings. This authority is conferred without regard to the jurisdiction of the county court over cases of eminent domain. An eminent domain proceeding is instituted by filing a statement "with the county judge of the county in which the land or a part thereof is situated." Article 3264, § 1, V.A.C.S. When the statement is filed, "the county judge shall" appoint special commissioners to assess damages. Article 3264, § 2. If no objections to the award of the Commissioners are filed within the prescribed time, "the County Judge shall cause said decision to be recorded in the minutes of the County Court." Article 3266, § 7. The provisions of these general statutes can and should be accommodated with the provisions of Articles 1970–339 and 339A. See State v. Standard Oil Co., 130 Tex. 313, 107 S.W.2d 550, 559 (1937) in which the court said in part: "* * * We are to interpret the language used in a manner to make all relevant laws harmonious if we can, * * *" Articles 1970–339 and 339A do not expressly divest the county judge of the authority conferred by these statutes over the preliminary proceedings in eminent domain. We believe that his authority over these proceedings is reserved as one of the ex officio duties conferred on the county judge. In the absence of a clear removal of this authority from the county judge, sound principles of statutory construction indicate such has been retained. See 3 Sutherland; Statutory Construction, § 6803, pp. 327–328.

We therefore hold that because of the express authority over the administrative proceedings in eminent domain conferred upon the county judge by Articles 3264, 3265, 3266 and 3267, V.A.C.S., and the well-defined distinction between administrative or ministerial duties performed by the county judge and the jurisdiction of a court, as such, to hear and determine a case after the filing of objections, it should be concluded that the county judge of Nueces County had authority to administer the preliminary proceedings as an "ex officio duty."

Appellee also contends that its position on this phase of the case is supported by the uniform construction and practice subsequent to the 1967 Amendments by those charged with their administration and by the practicing bar, but we do not believe it necessary to rest our decision on that ground.

Appellants also argue that the county judge of Nueces County could validly exercise the administrative function of appointing Condemnation Commissioners only if the County Court of Nueces County, over which he then presided, had eminent domain jurisdiction. Appellants here rely upon Henderson v. Texas Turnpike Authority, 308 S.W.2d 199 (Tex.Civ.App.— Dallas, 1957, writ ref'd), for this proposition. In *Henderson* the judge of Court No. I in Dallas County presided over the administrative proceedings and entered judgment on the award when no objections were filed in his court. The landowners had, however, filed objections to the award with the county clerk and knowingly permitted them to be filed and docketed in Court No. II. Court No. II entered Summary Judgment dismissing the case upon a showing that Court No. I had already entered Judgment on the Commissioners' award. In affirming, the Court of Civil Appeals held:

"  *  *  *  the objections to the commissioners' award should be filed in the court presided over by the Judge who,

until the filing of the objections, has acted only as an administrative agent in the condemnation proceedings. In other words, we think that in the instant the petition or objections filed by appellants with the County Clerk should have been docketed in County Court at Law No. 1, *  *  *; and that the written objections should be kept in the same file or jacket with the papers filed earlier in the condemnation proceedings." Id., 308 S.W.2d at 201.

The court did not hold that the authority of a county judge, as county judge, to administer preliminary proceedings in condemnation is dependent upon jurisdiction to try cases in eminent domain after the filing of objections. Likewise, the court did not hold that the judge who appointed the Special Commissioners was required to try the case which commenced upon the filing of objections to the award.

In the case at bar objections to the Commissioners' award were filed by appellee with the county judge, who presided over the administrative proceedings, and the same were then filed with the county clerk. Appellants filed their objections with the county clerk. Unlike the Henderson case, neither appellee nor appellants filed their objections with a different judge or with a different court from where the matter was pending. Upon the filing of such objections, however, the county clerk complied with Article 1970–339A, Section 19, and docketed the civil case for trial in Court No. II.

In *Henderson*, the court stated that its conclusion was based upon the "implication" of Arts. 3264–3271, V.A.C.S., since the Legislature had made no express provision for docketing. In the instant case the express provisions of Article 1970–339A, Section 19, V.A.C.S., govern the docketing of cases in Nueces County. That section reads as follows:

"Sec. 19. On or before January 1, 1955, the County Clerk of Nueces County shall establish a separate docket for County

Court at Law No. 1 and a separate docket for County Court at Law No. 2. The present docket of the County Court at Law shall become the docket of the County Court at Law No. 1. All criminal cases on which original jurisdiction is vested by law at the County Court level shall be retained by the Clerk on the docket of the County Court at Law No. 1. All civil cases, plus all criminal cases which have been appealed to the County Court level from inferior Courts, shall be transferred by the County Clerk to the docket of the County Court at Law No. 2. Thereafter, as new cases are filed with the County Clerk, he shall docket said cases as follows: All criminal cases on which original jurisdiction is vested by law at the County Court level shall be docketed in the County Court at Law No. 1; and all civil cases, plus all criminal cases appealed from Courts of inferior jurisdiction, shall be docketed in the County Court at Law No. 2. Each of said Courts shall give preference to the cases which are originally docketed in their Court."

The policy reasons which existed for the holding in *Henderson* are also absent in the case at bar. In *Henderson* the administrative proceedings were pending before one judge while the objections to the award were pending before another judge; and the court expressed concern that if each of the several parties named in the original condemnation statement had filed objections, "their objections could be filed in different courts, as appellants contend, endless confusion would result." 308 S.W.2d at 201. This is not the case in Nueces County.

Article 3266, § 8, V.A.C.S., is quoted by appellants for the proposition that a County Court at Law, when eminent domain jurisdiction is conferred on it, has authority also to exercise the preliminary administrative functions in eminent domain. Appellants then imply from this that such authority is exclusive in Court No. I in Nueces County. This result does not necessarily follow, Section 8 of Article 3266 was a 1961 amendment. Such an amendment was not necessary as late as 1961 to confer authority upon the County Courts at Law and District Courts similarly situated to administer the preliminary proceedings in eminent domain. Those courts with jurisdiction so vested had possessed such authority for some years. See, e. g., Henderson v. Texas Turnpike Authority, 308 S.W.2d 199 (Tex.Civ.App., Dallas, 1957, writ ref'd), in which Court No. I appointed Special Commissioners at least four years before Section 8 was added to Article 3266. The purpose of Section 8 was simply to require the judges and clerks of county courts at law and district courts, when eminent domain jurisdiction is lawfully vested in such courts and where such judges and clerks attempt to perform functions in such proceedings, to carry them out as otherwise provided for county judges and clerks under the general law. Section 8 of Article 3266 cannot be construed, however, as one which gives exclusive authority to such courts and judges, nor one which deprives the county judge of functioning under the authority vested in him as county judge, under the general law, particularly where his ex-officio duties have been specially reserved to him.

■ The County Judge of Nueces County in the case at bar had full authority to receive the statement in condemnation, to appoint Commissioners, to receive the award and to accept the filing of the objections thereto, even assuming (without deciding) that the jurisdiction of the County Court itself to try the case upon the filing of objections had been transferred to the County Courts at Law No. I and II.

Appellants' point one is overruled.

We now consider appellants' point two which asserts that the trial court erred in granting appellee's motion for instructed verdict. Appellants say that when the evidence admitted is considered most favorably to them, fact issues were raised which should have been submitted to the jury.

Appellee contends that there was no evidence of probative force to support findings of value as to the easement taken and damages, if any, to the remainder, and that the instructed verdict was proper. We agree with appellants.

On the trial of the case three witnesses testified and a number of exhibits were admitted in evidence. The three witnesses were William N. Sessions, an employee of appellee, who was a civil engineer with the pipe line design section of the company; Ogden Fitzsimmons, a professional chemical engineer; and Jack Grant, one of the owners of the 280 acre tract here involved. Appellants offered in evidence Defendant's Exhibit A, a large chart or map of the U. S. Department of Commerce, showing Mustang Island and a large area surrounding it containing considerable information; Defendant's Exhibit B, apparently prepared by or for Nueces County Navigation District Number One, also showing Mustang Island and adjoining areas; Defendant's Exhibit C, being a map or plat of the 280 acre tract involved and some of the adjoining areas, prepared by the engineering department of appellee, particularly showing the pipe line right of way easement and temporary working area; and Defendant's Exhibits D and E, being aerial photographs of the 280 acre tract and surrounding area. Appellee offered in evidence Plaintiff's Exhibit 1, a large map prepared by Edgar Tobin aerial surveys, showing a considerable area in the vicinity of Mustang Island, which included the particular 280 acre tract, the location of the pipe line running from a well on the Gulf side of Mustang Island, across the Island and appellants' tract to a production platform, located in the bay to the west of the island; Plaintiff's Exhibits 2 and 3, being color photographs of the easement area after the pipe line was installed, and Plaintiff's Exhibit 4, being an oil and gas lease on the 280 acre tract.

The witness William N. Sessions, appellee's engineer testified in part as follows: He began working on the pipe line here involved in the latter part of 1967. It was constructed about the middle of 1968. The pipe is 8⅝ inches outside diameter, one-fourth inch in thickness, and is classified Grade B, 35,000 pound yield. The line is 7.2 miles in length and approximately one-half of it is off shore. It starts in the Gulf and ends in Corpus Christi Bay. The witness used and referred to several of the exhibits including Plaintiff's Exhibit 1 and Defendant's Exhibits A, C and D. The line carries gas with a certain amount of distillate which is highly flammable. The line is intended to operate at a maximum pressure of 1200 pounds per square inch. The chief engineer of appellee's pipe line department made the design as to the route of the pipe line. Mr. Sessions testified with reference to Defendant's Exhibit C that there were three interruptions shown thereon in the continuity of the pipe line on appellants' tract. At each of these three locations the pipe line was lowered by appellee to minus 8 Mean Sea Level. In response to questions by counsel for appellants, Mr. Sessions testified as follows:

"Q What is the purpose of making those interruptions in the continuity of the pipeline?

A Well, in our original testimony I believe it was brought out that the best use for this property was brought out to be a Marina and to go along with the thinking of people we lowered the pipeline at these places so that we would not hamper your thoughts along that line.

Q So that it would not curtail the development as a Marina?

A Yes, sir.

Q Did the same people make the decision to bury the line at only the minus eight feet?

A Yes, this was the elevation that was decided on by the people who makes these decisions.

Q What people?

A We had counsel with other people who know about developments of Marinas. We made also one lowering of the pipeline on Mrs. Wilson's property at this location here.

Q Would you draw in that lowering of the pipeline to your best recollection and knowledge?

A It is right along here.

Q Were there any other lowerings of the pipeline as you came across the Island?

A No, sir.

Q Then at all other places, we can assume that the pipeline lies buried at 3 feet?

A That is right.

Q Then, we will go to Defendant's Exhibit A. At what point is the pipeline buried below mean sea level from its point of origin until it gets to the Island?

A From our Corps of Engineer's Firm we have to submit to them to get the authority to build a pipeline such as this. Beginning at the platform itself, where we pick up the gas for a distance of a few hundred feet, our piepline is buried to a depth below the bottom mud line of six feet. After that coming back toward shore to a water level of approximately minus 20 feet we bury to a depth of 5 feet below the mud line and then it goes to about six feet as we approach the shore and then to three feet.

Q From the point where it leaves the Grant property and enters the bay, would you tell the Jury your measurements there at below mean sea level?

A As we leave and go back into this area here we are at three feet below the level of the natural ground. Is that your question?

Q At what depth in the bay did you bury your pipe and did you bury it there?

A No, in this area here this is mud flats here and we buried it to a minimum of two feet.

Q Who owns the mud flats?

A The State of Texas. It is two feet below the mud line.

Q When you get into the Bay Proper at what depth did you maintain the line?

A This shows it is two feet below the mud line.

Q Without regard to the depth of the water?

A Well, in this area there is very little water. This is mainly mud flats in that area. Did I misunderstand your question?

Q No, if I understand you, you had drawn a platform generally in an area that shows to be in 12 foot water.

A Well, this blue area here is not water at all. In most places it is mud flats."

Mr. Sessions also testified that the pipe line crossed under a highway which runs generally north and south on Mustang Island. Safety precautions are taken at that point. The pipe is buried 36 inches below the ditches on either side of the highway and the pipe line is encased in a larger pipe. The pipe line is buried about 6 to 8 feet below the highway. The reason for the extra precautions is that the ditches are graded by heavy machinery and the pipe line might be ruptured if struck by the same. Mr. Sessions said that no safety precautions were taken on appellants' tract at the locations where the pipe line had been lowered for channels to be dug. He further testified that he had been on the tract in question three times, in March, November and December, 1968. Construc-

tion of the pipe line had been completed on the last two occasions. He said that most of the land had an elevation above mean sea level of four and a half feet to eight feet. He referred to Defendant's Exhibit C (being a plat prepared by appellee's engineering department, with a scale of one inch to fifty feet) and said there was a portion of the tract of lower elevation near where it had access to the bay—probably two or three feet; that he walked on an area of lower land—more or less mud flat —which was around 15 to 20 acres. He characterized some of his estimates as a guess but said in substance that the lower area was roughly that and that "I would say that would be about right." On cross-examination by counsel for appellee Mr. Sessions referred to and used Plaintiff's Exhibit 1. He colored appellants' property in yellow and indicated the route of the pipe line by a red line on the exhibit. He identified the Gulf and Corpus Christi Bay sides of Mustang Island. He specifically indicated the mud flat area behind appellants' property on the exhibit and shaded it in with pencil on the same. He also testified, still using the exhibit, the area into which the mud flats extended. He guessed there was an area of about 20 to 30 acres of mud flats. On re-direct examination, Mr. Sessions testified that Defendant's Exhibit D (an aerial photograph of appellants' tract and the surrounding area taken after the pipe line was installed, with a scale of one inch to four hundred feet) truly and accurately depicted the entire area. He identified the pipe line right of way across appellants' tract and the places where the line was lowered. Mr. Sessions also testified as to the location of the salt flat area as shown on the aerial photograph, and that the rest of the land was well elevated, as he had earlier described it. Mr. Sessions further testified that occasionally there are leaks in pipe lines which have to be repaired, but that appellee attempts to make a pipe line as safe as possible in their installations and by inspections.

The testimony of Mr. Ogden Fitzsimmons, a professional chemical engineer, related principally to the subject of resultant dangers to lives of people in the event of failure or rupture of a high-pressure gas line.

The only testimony concerning value of the land was given by appellant Jack Grant, who was the owner of a ⅑ undivided interest in the 280 acre tract in question. Grant testified in substance as follows: Mustang Island is about 18 miles in length. It is bounded on the east by the Gulf of Mexico, on the west by Corpus Christi Bay, on the north by Aransas Pass and St. Joseph Island, and on the south by Corpus Christi Pass and Padre Island. The 280 acre tract here involved is located on the Bay or western side of the Island. The city of Port Aransas is located on Mustang Island about 9 or 10 miles north of appellants' tract and there is development about 6 miles south of it. The tract is situated about midway between the areas being developed. He had been acquainted with the tract on Mustang Island over a period of many years, since it had been ranched by both his father and grandfather. He was not only one of the owners of the tract but was shown to be qualified as an expert witness, having had considerable experience with real estate subdivisions and the construction business. Grant testified that the highest and best use of the land, prior to the taking of the easement of 3.45 acres and installation of the high-pressure gas line was for a residential Marina type of development. He testified in some detail as to the reasons why the particular tract was advantageous for that type of development. One of these reasons was on account of the natural height of the land. He said it would not be necessary to pump sand to build up the land. The cost of doing this, when necessary, was $1,000.00 per acre foot, and it had been done on other areas of the Island. He also testified that other developments in the area had some danger of being washed out and had been in the past, but

this one had not been disturbed. Another advantage was the proximity of the tract to the City of Corpus Christi from where most of the buyers would come; also, that the tract was straight across the bay from the center of population and permitted travel by boat of a short distance compared to other developments. The tract is situated within a water district. He also testified there was a scarcity for sale of other tracts containing about 200 acres in the area. He further said there are no Marinas on the Gulf side of the Island, because a channel could not be kept open without building a jetty.

Grant testified that in his opinion on April 8, 1968 the land "other than the flat land", assuming it did not have a pipe line running through it, had a fair market value of $5,000.00 per acre. He further gave his opinion in response to a question concerning the "salt flat" land, without a pipe line running through it, "those few acres, 20 or 25 acres" that the fair market value was $1,000.00 to $1,200.-00 per acre. Grant further testified that the 3.45 acre easement area had no value after the taking and the remainder of the tract had a per acre value of $30.00 or less (for grazing purposes) after the taking. He testified that after the pipe line was installed the land would not have a use for residential development. Concerning the actual easement area, Grant said the turf had been killed for the present time; that asphalt or emulsion or oil had been placed on the easement area to stabilize the sand. Grant referred to and used several of the exhibits in connection with his oral testimony.

The final question asked by counsel for appellants and Mr. Grant's answer thereto are as follows:

"Q Mr. Grant, I believe when we recessed last I had just asked you to tell the Jury why it was that you testified that as far as Marina or residential purposes this land in question had been reduced to grazing or pasture land. Can you give your reasons for that, please?

"A Well, I will try to simplify it by saying that any prospective buyer for a Marina-type of residential subdivision has certain basic things that he has to know in order to insure himself that he is going to make a profit. They usually start out by knowing they will have to finance it during a period of construction and the houses will have to have loans on them and he has to know if he can get the money to purchase the property or he may start out with a bank for construction money. The bank usually does this and when it is complete the man already has a commitment from somebody else to take over the loan. The next phase of the financing is usually getting the financial inspection from a savings and loan or somebody who is going to loan the money on the property.

"They have a release clause on there where he can get approval on the house and when he sells the house that lot is released by whoever financed the deal and the financing is with the last owner of that particular house. When he knows he can do this, he is ready to purchase the land. Another thing confronting the developer is what restrictions he is going to be put to in which he has no control over whatsoever, such as will he be able to have his people to plot the channel and the water line and everything else and know that no one is going to restrict other than that in order to get the most number of lots on that ground so he can make the most profits on it. On this particular piece of ground he is going to find out that his channel arrangement has been laid out for him already at three intervals of 1,000 feet each. Then the question is going to be whether he can make any money with the channels 1,000 feet apart. Then he is going to look around and see what his competition is. If he goes to the East he will find a ten

foot depth channel and if goes South he is then going to find out that these channels are going to be only 8 feet, but suppose he is satisfied with 8 feet and then when he goes to get the contractor to dig the channels they know that he can not come that close to the pipeline and Number Two, he knows that sometime during that period of time he is going to have to clean out that channel again.

"There is always a little bit of slippage there and you dig them deeper for that reason.

"When he discovers that he is going to immediately find out that he could not get enough lots backed up to the channel with a street on the front that he could never come out on it. You have to get the most number of lots with channels in back and streets in front, so he is going to walk away from it. Furthermore, if he should decide to try to stretch that thing out the next thing he is going to have to do is satisfy the Insurance Companies about the pipeline. He is going to have to make the signs to put up reading 'Danger High Pressure Line,' or 'Don't drag your anchor.' He is not going to buy it because of these things and therefore it is I think back to grazing land again."

Appellee's argument in support of the instructed verdict and judgment for $1.00 is that "There was no evidence of probative value by any witness on the following matters: (1) The number of acres of land 'other than flat land'; (2) The number of acres of 'salt flat land'; (3) The number of acres of land 'other than flat land' in the taking; (4) The number of acres of land 'other than flat land' in the remainder; (5) The number of acres of 'other than flat land' in the 3.45 acre easement; (6) The number of acres of 'salt flat land' in the 3.45 acre easement; (7) The basis upon which the witness Grant determined that the 3.45 acre tract had no value after the taking; (8) The basis upon which the

witness Grant determined the entire 276.55 acre remainder was damaged by virtue of the taking." We disagree with such contentions.

■ In determining the correctness of a judgment based upon a directed verdict, which in this case was against appellants, we are governed by the rule that the evidence in the record supporting appellants' position must be accepted as true and all conflicts and inconsistencies must be resolved in appellants' favor. We must disregard all evidence and the inferences therefrom favorable to appellee and interpret the evidence and all the reasonable inferences to be drawn therefrom most favorably to appellants. Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953); Anderson v. Moore, 448 S.W.2d 105 (Tex.Sup.1969).

When we apply these rules and particularly consider the testimony of Jack Grant, William N. Sessions and the various exhibits in evidence we are of the opinion that there was evidence of probative force from which the jury could have determined the number of acres "other than flat land" and the number of acres of "salt flat land" in the entire 280 acre tract, in the easement taken and in the remainder.

However, even if such conclusion is incorrect and the jury could not ascertain from evidence of probative force the exact number of acres in the two types of land, nevertheless, as to the values in the easement strip before the taking the testimony of Jack Grant ($5000.00 an acre for the high land, and $1000.00–$1200.00 per acre for the low land) would at least support a finding that the 3.45 acre easement strip had a value of $1000.00–$1200.00 per acre. As to the value of the easement strip after the taking, there was evidence that it had no remaining beneficial use to appellants and, in effect, was a complete taking so as to authorize recovery for the market value of the land. See Thompson v. Janes, 151 Tex. 495, 251 S.W.2d 953 (1952). However, even if there was some remaining

use and value to appellants of the 3.45 acre easement area, there was testimony by the witness Grant, from which it could be inferred and which constituted some evidence that the value of the easement strip after the taking would be $30.00 per acre or less. What we have said concerning the 3.45 acre easement strip is generally applicable to appellants' claim for damages to the remainder of the tract. The jury could have found that the remainder had at least a market value of $1000.00 to $1200.00 per acre before the taking and $30.00 afterward. See State v. Scarborough, 383 S.W.2d 839 (Tex.Civ. App., Texarkana 1964, wr. ref. n. r. e.); Natural Gas Pipeline Company of America v. Towler, 396 S.W.2d 917 (Tex.Civ. App., Corpus Christi, 1965, n. w. h.).

■ Since appellants' point 2 must be sustained, it follows that their point 3 is also well taken. The trial court should not have instructed a verdict and rendered judgment in favor of appellants for nominal damages of $1.00 or ordered that $4,049.00 of the deposit made by appellee be returned to it.

The judgment of the trial court will be reversed and the cause remanded for new trial.

## ON MOTION FOR REHEARING

NYE, Justice (dissenting and concurring).

I withdraw my original dissenting opinion and substitute the following opinion therefor.

The appellee correctly concedes that the applicable rule on a no evidence point is that the appellate court must accept the evidence and the inferences therefrom in the aspect most favorable to the appellants and must disregard all contrary evidence and inferences. Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (Tex.Sup.1953). Applying this rule to all of the evidence in the light most favorable

to the appealing party, I would hold that the appellants have failed to produce sufficient evidence of probative value from which a jury could have determined at least one of the essential elements of appellants' cause of action. This being true, the trial court was correct in instructing a verdict for nominal damages at the close of appellants' case.

The parties stipulated and agreed that the only issues to be tried were those of value and damages. Thereafter, the burden of proof rested upon the appellants to prove damages as to the part taken, by virtue of the easement, and the damages to the remainder. McDowell v. Central Power & Light Company, 420 S.W.2d 816 (Tex. Civ.App.—Corpus Christi 1967) and cases cited therein. The essential elements which the appellants were required to prove, relate to: 1) the value of the land within the easement prior to the taking; 2) the value of the land within the easement area after the taking, burdened with the easement; 3) the value of the remainder of the land outside the easement area before and taking; and 4) the value of the remainder of the land outside the easement area after the taking.

The appellants state that there were only two types of land within and without the easement strip involved: Low land consisting of mud flats (salt flat land) and high land on which there was grass for cattle grazing. The appellants set out the evidence in their brief and emphasize that evidence upon which they rely in support of a reversal. This evidence differs from the evidence relied on by the majority of this Court. The following evidence and argument is what the appellants contend will support the issues:

"The undisputed and uncontradicted expert testimony given by landowner Jack Grant as to the value of the high land in the easement strip and in the remainder area before and after the taking necessarily included his opinion that the value of that high land was at least as

great as the value of the low land in the mud flats.

This being true, it follows that the jury, had it been unable to tell from the evidence the quantum of each of the two kinds of land, could have treated all the land as low land and could have properly applied thereto the uncontroverted low land values testified to by Mr. Grant.

By doing so the jury would have found in his testimony evidentiary support for findings establishing the following: that the value of the easement strip before the taking was $1,000 an acre and that its value after the taking was zero; and that the value of the remainder area was $1,000 an acre before the taking and was $30 an acre after the taking.

This shows that the uncontradicted value testimony adduced by appellants would have supported a substantial recovery."

In the first place I disagree with the majority as I believe there is absolutely no way of determining the number of acres of lowland (mud flats or salt flats) in the 280 acre tract upon which a jury could have assessed a value of $30.00 per acre, (either within or without the easement). The witnesses did not testify as to how many acres there were involved in each tract. The map and aerial photographs are not detailed or scaled in such a way that a juror could do more than guess or estimate the number of acres involved. This is what the witnesses did.

The majority states in their opinion, that if they are incorrect in assuming the jury could ascertain the exact number of acres of mud flats (low land) and high grazing land, then the jury could determine that the remainder of the easement after the taking had *"no value"*.[1] This, they say, would authorize a jury to find that the appellants could recover *"the full market value of the land taken."* This has never been the law in Texas under these set of facts.

It was undisputed that the landowners reserved the mineral estate and the right to cross to and from their separated tracts on either side of the easement. This left the landowner with some beneficial use. It was said by the Supreme Court in the very case cited by the majority (on the "no value" theory) [2] that: " * * * If the easement leaves the landowners with some beneficial use of the land, as it does, for instance, *in the case of easements for pipe lines,* power lines or other similar purposes, then the damages for the condemnation thereof, *as a matter of law,* will be less than the value of the fee. * * *" Texas Pipe Line Co. v. Hunt, 149 Tex. 33, 228 S.W.2d 151 (Tex. Sup.1950).

Alternatively, it is said by the majority of this Court, that if they are mistaken in what they have said above, and there is some remaining use and value to the easement taken, it could be inferred from the testimony of *"witness Grant"* that the easement strip would be worth $30 per acre after the taking. On a "no-evidence point" we must resolve all conflicting testimony and inconsistencies in appellants' favor, but I cannot interpret any reasonable inference from witness Grant's testimony "that the value of the easement strip after the taking would be $30.00 per acre or less". In fact, the appellants themselves argue that witness Grant said just the opposite. In appellants' original brief appellants state: "After the taking, the part of the tract covered by the easement taken by appellee, comprising 3.45 acres, was no longer of beneficial use to the appellants.[9]" Appellants' footnote 9's explanation of the evidence is absolutely contradictory to this Court's inference of the same evidence. Footnote 9 says in part: "This fact (that the easement strip after the taking had no value) *could have been inferred by the jury* from the following testimony given by landowners *Jack Grant* * * *" Appellants then quote from certain excerpts of *Grant's testimony* and summarized his tes-

---

1. Emphasis supplied throughout.

2. Thompson v. Janes, 151 Tex. 495, 251 S.W.2d 953 (1952)

timony as expressing an opinion that the easement area had no value at all after the taking. Such judicial obfuscation arising out of these contradictory inferences, does not amount to evidence that would be legally sufficient to submit to a jury.

Appellee contends that there was an absence of proof of certain other vital facts whereby the trial judge was necessarily constrained to instruct the jury to return a verdict of nominal damages on the following matters:

(1) No evidence as to the value of the 3.45 easement strip before and after the taking.

(2) No evidence as to the value of the 276.55 acre tract remaining before and after the taking.

(3) No evidence of the market value of the easement taken and in the remainder both before and after the taking of the easement.

(4) No evidence as to the number of acres of other than flat land or the number of acres of salt flat land in: (a) the 280 acre tract; (b) in the easement taken; and (c) in the remainder.

(5) No evidence of damage to the entire 276.55 acre tract remaining after the taking.

Having reviewed all of the record and without discussing each of the above matters asserted by the appellee I agree that there was no evidence on at least one of the essential elements of appellants' case, and probably others. Without evidence of probative value sufficient to support the submission of each element that was required to be proved the trial court's judgment instructing the jury to return a verdict for nominal damages was correct.

I agree with the majority of this Court that the County Court at Law No. 2 of Nueces County had eminent domain jurisdiction by virtue of the existing laws affecting the court.

The acceptance given by attorneys, the courts, and the public generally to the jurisdiction of the County Court at Law No. 2 of Nueces County, has remained unchallenged by everyone. For over two years, since the 1967 amendment was passed by the Legislature affecting the County Court at Law No. 2, its jurisdiction has been unquestioned. The particular amendment involved, enlarged the authority and jurisdiction of both the County Court at Law No. 1 of Nueces County and the County Court at Law No. 2 of Nueces County, to include matters of probate, eminent domain and lunacy. The appellants argue that jurisdiction in such matters was not given to the County Court at Law No. 2 by the Legislature. The public records of the County Court at Law No. 2 reflect that since the effective date of the 1967 amendment, approximately 1000 orders pertaining solely to matters of probate, eminent domain and lunacy have been signed and entered by the judge of the County Court at Law No. 2. This Court (No. 2) has handled almost all of the matters of probate, lunacy and eminent domain trials during the past two year period while County Court at Law No. 1 has handled nearly all of the criminal cases. The appellants' challenge to County Court at Law No. 2 as to eminent domain jurisdiction, would also amount to a challenge with equal force to the Court's jurisdiction as to probate and lunacy matters as well.

The Legislature by Art. 1970–339A, Sec. 3 conferred upon County Court at Law No. 2 concurrent and identical jurisdiction with County Court at Law No. 1. In 1967 the Legislature enlarged the jurisdiction of County Court at Law No. 1 to include probate, eminent domain and lunacy cases. In the same act the Legislature evidenced a clear intent to include eminent domain jurisdiction on County Court at Law No. 2 as well. It so stated in its caption.[3] The

---

**3.** "An act—enlarging the authority and jurisdiction of both the County Court at

Law No. 1 of Nueces County, Texas, and the County Court at Law No. 2 of Nueces

Legislature on the other hand made no attempt to repeal any previously enacted section or sections that would otherwise conflict with this purpose. Therefore, by construing all applicable laws affecting County Court at Law No. 2, the intent of the Legislature can thus be ascertained. Maddox v. Flato, 423 S.W.2d 371 (Tex. Civ.App.—Corpus Christi, 1967, ref. n. r. e.). Our Supreme Court noted that the courts of Texas have consistently given controlling effect to the purpose stated in the caption of the legislative act involved, to arrive at the legislative intent. Southwestern Bell Telephone Company v. Houston Independent School Dist., 397 S.W.2d 419 (Tex.Sup.1965).

The purpose as stated by the Legislature in the caption of this Act is unassailable. The intention of the Legislature once ascertained, is the law.

The jurisdiction of the Texas Supreme Court was challenged on a certain occasion, because certain statutes then existing did not specifically confer appellate jurisdiction on that Court on a particular type of case before it. Spence v. Fenchler, 107 Tex. 443, 180 S.W. 597 (Tex.Sup.1915). The Court, after discussing the applicable portions of the various statutes involved, said this:

"However, *jurisdiction may be conferred upon a court by necessary implication as effectually as by express terms.* It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative. (Citing authority) Every portion of a statute should be construed in connection with every other portion to produce a harmonious whole. (Authority cited)

Another well-settled rule of construction is: '*That which is implied in a statute*

County, Texas, to include matter of *probate, eminent domain, and lunacy;* * * * *repealing all laws or parts of*

*is as much a part of it as that which is expressed.'* (cases in authority cited)"

The Supreme Court went on to say that the specific provisions of certain articles * * *

" * * * indicate, unmistakably we think, at least by necessary implication, the legislative purpose to confer appellate jurisdiction upon this court. Those references to the Supreme Court must be given some meaning and legal effect. They cannot be treated as mere surplusage. Yet to deny that their effect is to confer jurisdiction upon this court is to render them utterly meaningless. Only upon the theory that the statute was meant to confer appellate jurisdiction upon this court was it at all reasonable for the Legislature to insert therein said provisions relating to briefing, advancing, calling, and hearing such cases in the Supreme Court. Our conclusion is well supported by authorities in addition to those already cited.

In a somewhat similar case, wherein it was contended that, in the absence of language expressly and specifically conferring upon a court the jurisdiction in question such jurisdiction did not exist, the Supreme Court of Missouri said:

'We regard this contention as extremely hypercritical verbal criticism. There is no set form of words required to confer jurisdiction. To hold that this act was not a grant of jurisdiction because formal words such as those above indicated were omitted would be sacrificing substance to form. * * * Our imperative duty is to ascertain, if possible, the intention of the Legislature from the language employed.'"

The appellants have further contended that the county clerk had no power to transfer this case from the county court docket to the County Court at Law No. 2 docket.

*laws in conflict herewith;* * * * *"* (emphasis supplied)

This condemnation proceeding was a civil case, once objections to the award were filed by both parties. Pearson v. State, 159 Tex. 66, 315 S.W.2d 935 (Tex.Sup. 1958). The clerk's duty imposed by Article 1970–339A § 19 provides that all "civil cases" shall be docketed by the clerk in the County Court at Law No. 2. The county clerk of Nueces County serves as Clerk for three county courts: (A) The County Court, (B) the County Court at Law No. 1, and (C) the County Court at Law No. 2. The county clerk of Nueces County and the three courts involved, have uniformly construed the docketing statute in this manner. In any event, any technicality in this respect was waived by the appellants by their proceeding to trial without objection. This point cannot be raised for the first time on appeal.

I would affirm the trial court's judgment, overruling appellants' motion for rehearing and granting appellee's motion.