# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

August 23, 1991

Honorable Carl A. Parker
Chairman
Senate Subcommittee on Insurance
P. O. Box 12068
Austin, Texas 78711

Opinion No.   DM-33

Re:  Construction of House Bill 2, 72d
Legislature, amending the Insurance
Code   (RQ-116)

Honorable John Montford
Chairman
Senate Finance Committee
P. O. Box 12068
Austin, Texas 78711

Honorable Eddie Cavazos
Chairman
House Committee on Insurance
P. O. Box 2910
Austin, Texas 78768

Honorable Mark Stiles
Chairman
Local and Consent Calendars
P. O. Box 2910
Austin, Texas 78768

Gentlemen:

You ask about the construction of House Bill 2, which was enacted by the 72d Legislature and effects substantial revisions to the Insurance Code.  Acts 1991, 72d Leg., ch. 242, at 939, Vernon's Sess. Law Serv.  Specifically you ask:

> 1. Will the provisions of House Bill 2, in particular Section 2.02, deregulate Lloyds and reciprocal insurance companies as to rate or form for automobile insurance?

> 2. Will the provisions of House Bill 2 preclude the State Board of Insurance from allowing insurers to utilize experience rating for automobile insurance?

We answer both of your questions in the negative. We conclude that section 2.02 of House Bill 2 applies to Lloyd's plans and reciprocal or interinsurance exchanges. We further conclude that House Bill 2 does not preclude the State Board of Insurance [hereinafter the board] from allowing insurers to utilize experience ratings in fixing rates for premiums for automobile insurance. We turn to your first question.

Chapter 5 of the Insurance Code governs rating and policy forms that are to be used by those companies, corporations, or associations providing certain kinds of insurance regulated by the code. Subchapter A governs the rating and policy forms for motor vehicle insurance. Prior to the enactment of House Bill 2, article 5.01 of the code, which governs the fixing of the rates for automobile insurance, provided in pertinent part:

> (a) *Every insurance company, corporation, interinsurance exchange, mutual, reciprocal, association, Lloyd's or other insurer, hereinafter called insurer, writing any form of motor vehicle insurance in this State*, shall annually file with the State Board of Insurance, hereinafter called Board, on forms prescribed by the Board, a report showing its premiums and losses on each classification of motor vehicle risks written in this State.

> (b) The Board shall have the sole and exclusive power and authority, and it shall be its duty to determine, fix, prescribe, and promulgate just, reasonable and adequate rates of premiums to be charged and collected *by all insurers writing any form of insurance on motor vehicles in this State* .... In promulgating any such rating plans the Board shall give due consideration to the peculiar hazards and experience of individual risks, past and prospective, within and outside the State ....

> . . . .

> (e) *Motor vehicle or automobile insurance as referred to in this subchapter shall be taken and construed to mean every form of insurance* on any automobile or other vehicle hereinafter enumerated ....

Ins. Code art. 5.01 (emphasis added).

Section 2.02 of House Bill 2, the section about which you ask, amends article 5.01 of the Insurance Code by adding a subsection (f), which provides:

Notwithstanding Subsections (a) through (d) of this article, on and after September 1, 1992, rates for motor vehicle insurance in this state are determined as provided by the flexible rating program adopted under Subchapter M of this chapter.[1] This subsection expires December 31, 1995.

Acts 1991, 72d Leg., ch. 242, § 2.02, Vernon's Sess. Law Serv. at 955. You ask whether subsection (f) applies to Lloyd's plans and interinsurance exchanges.

Chapter 18 of the Insurance Code governs the operations of Lloyd's plans in Texas. The amended version of article 18.23 of the code, as set forth in section 2.46 of House Bill 2, exempts underwriters at a Lloyd's from the operation of Texas insurance laws unless specifically provided:

(a) Underwriters at a Lloyds' shall be exempt from the operation of all insurance laws of this State except as in this Chapter specifically provided, or unless it is specifically so provided in such other law that same shall be applicable.

(b) In addition to such Articles as may be made to apply by other Articles of this Chapter, underwriters at a Lloyds' shall not be exempt from and shall be subject to all of the provisions of Article 1.15A and of Article 2.20 and of Article 5.35 and of Article 5.38 and of Article 5.39 and of Article 5.40 and of Article 5.49 and of article 21.21 of this Code.

*Id.* § 2.46 at 977.

---

[1]Subchapter M is set forth at section 2.01 of House Bill 2 and is intended to create a pilot program on flexible rating in order to stabilize the rates charged for insurance

in *all lines of property and casualty insurance* covered by Subchapters A through L of this chapter, except [enumerated exceptions not relevant to the instant opinion request]. (Emphasis added.)

Acts 1991, 72d Leg., ch. 242, § 2.01, Vernon's Sess. Law Serv. at 952.

Chapter 19 of the Insurance Code governs the operation of reciprocal exchanges and contains an article substantially identical to article 18.23. The amended version of article 19.12 of the code, set forth in section 2.47 of House Bill 2, provides:

> (a) Reciprocal or inter-insurance exchanges shall be exempt from the operation of all insurance laws of this State except as in this Chapter specifically provided, or unless reciprocal or inter-insurance exchanges are specifically mentioned in such other laws.

> (b) In addition to such Articles as may be made to apply by other Articles of this Code, reciprocal or inter-insurance exchanges shall not be exempt from and shall be subject to all of the provisions of Section 5 of Article 1.10 and of Article 1.15 and of Article 1.15A and of Article 1.16 and of Article 5.35 and of Article 5.36 and of Article 5.37 and of Article 5.38 and of Article 5.39 and of Article 5.40 and of Article 6.12 and of Article 8.07 and of Article 21.21 of this Code.

*Id.* § 2.47 at 977.

It is suggested that the fact that the newly added subsection (f) of article 5.01 of the code fails to mention specifically Lloyd's plans or interinsurance exchanges, as required by the provisions set forth above, indicates legislative intent that that subsection not apply to those carriers and precludes the application of that subsection to those carriers. We reject this argument for two reasons.

First, an amendment will be construed and harmonized with the act that it amends or to which it is added, and of which it forms a part. *American Surety Co. of New York v. Axtell Co.*, 36 S.W.2d 715 (Tex. 1931), *answer conformed to*, 38 S.W.2d 1110; *Shipley v. Floydada Indep. School Dist.*, 250 S.W. 159 (Tex. Comm'n App.--1923, judgm't adopted). Specifically, a new section, added by amendment, will be construed in view of the original statute as it stands after enactment of the amendment, and it and all sections of the new law must be regarded as a harmonious whole with all sections mutually acting on each other. *Schlichting v. Texas Board of Medical Exam.*, 310 S.W.2d 557 (Tex. 1958); *Grant v. United Gas Pipe Line Co.*, 457 S.W.2d 315 (Tex. Civ. App.--Corpus Christi 1970, writ ref'd n.r.e.).

Subsection (f), added to article 5.01, refers to "rates for motor vehicle insurance" and provides that such rates are determined notwithstanding the other subsections of the article. Subsection (a) of the article already includes by its terms Lloyd's plans and interinsurance exchanges. Subsection (b) empowers the board to set rates "charged and collected by all insurers writing any form of insurance on motor vehicles in this State." Even though neither type of carrier is mentioned specifically in subsection (b), it is beyond cavil that subsection (b) of article 5.01 applies to Lloyd's plans and interinsurance exchanges.

If we were to conclude that the newly added subsection (f) did not apply to those types of carriers merely because it failed to list them specifically, we would perforce conclude that subsection (b) did not apply to those carriers either, a construction that would have the effect of removing Lloyd's plans and interinsurance exchanges from the rate-making authority of the board altogether. This we are unwilling to do; such a construction clearly is at variance with the evident legislative intent of making all insurers writing any form of motor vehicle insurance in this state subject to the flexible rating program set forth in the newly added subsection M of chapter 5.

Second, in construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider, *inter alia*, the statute's legislative history, including legislative debates. Gov't Code § 311.023(3). *See National Carloading Corp. v. Phoenix-El Paso Express, Inc.*, 178 S.W.2d 133 (Tex. Civ. App.-- El Paso 1943), *aff'd*, 176 S.W.2d 564 (Tex. 1944), *cert. denied*, 322 U.S. 747 (1944). In the senate debate on House Bill 2, the senate sponsor of the bill declared the purpose of the bill to be, *inter alia*:

> We have created some innovative ideas on rate regulation *beginning with deregulation of general liability and commercial property insurance*, more or less as an experiment, and we have created in this bill a so-called flex rating plan for *regulated lines of property and casualty insurance*. This would allow the State Board to set a benchmark and allow companies to compete within a parameter set by the State Board above or below that benchmark to promote competition and hopefully low rates based on those persons who purchased insurance who are careful and who are good risks. (Emphasis added.)

Debate on Tex. H.B. 2 on the Floor of the Senate, 72d Leg. 1 (May 24, 1991) (transcript available from Senate Staff Services Office). We conclude that the

legislature intended, in enacting section 2.02 of House Bill 2, to make the newly enacted subchapter M applicable to all insurers writing any form of insurance on motor vehicles in Texas, including Lloyd's plans and interinsurance exchanges. We turn to your second question.

You ask whether the provisions of House Bill 2 preclude the board from allowing insurers to utilize experience ratings for automobile insurance. Article 5.04 of the code governs the use of experience as a factor in determining rates of premiums and, prior to the enactment of House Bill 2, provided:

> (a) *To insure the adequacy and reasonableness of rates the Board may take into consideration past and prospective experience, within and outside the State, and all other relevant factors*, within and outside the State, gathered from a territory sufficiently broad to include the varying conditions of the risks involved and the hazards and liabilities assumed, and over a period sufficiently long to insure that the rates determined therefrom shall be just, reasonable and adequate, and to that end the Board may consult any rate making organization or association that may now or hereafter exist.

> (b) As a basis for motor vehicle rates under this subchapter, the State Board of Insurance shall use data from within this State to the extent that the data is credible and available. (Emphasis added.)

Ins. Code art. 5.04.

Section 2.05 of House Bill 2 amends article 5.04 of the code by adding a subsection (c):

> Notwithstanding Subsection (a) and (b) of this article, on and after September 1, 1992, rates for motor vehicles are determined as provided by Subchapter M of this chapter. This subsection expires December 31, 1995.

Acts 1991, 72d Leg., ch. 242, § 2.05, Vernon's Sess. Law Serv. at 956. Thus, we need to examine the effect of subchapter M on the board's authority under subsections (a) and (b) to employ experience rating in order to fix rates for premiums.

Accordingly, in order to answer your second question, we must turn to the provisions of the newly enacted subchapter M, which amends chapter 5 by adding article 5.101. *Id.* at 952.

Section 3 of article 5.101 requires that rates used by insurers in writing property or casualty insurance for lines subject to article 5 be determined through the application of "flexibility bands"[2] to a "benchmark rate"[3] and are implemented on a file and use basis. Subsection (b) of section 3 imposes on the board the duty to promulgate a benchmark rate and a flexibility band for each line subject to article 5. In promulgating the benchmark rate and the flexibility band, the board may consider, *inter alia*:

> (1) past and prospective loss experience within the state and outside the state if the state data are not credible;

> (2) the peculiar hazards and experience of individual risks, past and prospective, within and outside the state;
>
> . . . .

> (13) any other factor considered appropriate by the board.

---

[2] Section 2(3) of article 5.101 defines "flexibility band" as follows:

"Flexibility band" means a range of rates relative to the benchmark rates set by the board by line, within which an insurer, during a set period relative to a particular line, may increase or decrease rate levels by classification without prior approval by the board. The board shall set the flexibility band as a percentage above and below the benchmark rate, which percentage need not be equal above and below that benchmark rate.

Acts 1991, 72d Leg., ch. 242, § 2.01, Vernon's Sess. Law Serv. at 952.

[3] Section 2(1) of article 5.101 defines "benchmark rate" in the following fashion:

"Benchmark rate" means the rate set annually by the board by line, relative to which the flexibility bands and statutory rate limitations apply.

Section 2(6) of article 5.101 defines "statutory rate limitation" to mean:

"Statutory rate limitation" means a minimum and maximum boundary on insurance rates that is based on a benchmark rate set by line by the board.

*Id.*

*Id.* at 952-53.

We note that the language of subdivision (2) is identical to the language of article 5.01(b), which in our opinion reflects legislative intent that the board authority to consider experience ratings not be impaired. Indeed, under subdivision (2) the board itself may consider experience rating or, for that matter, any information or data that it deems appropriate in determining the benchmark rate and the flexibility band.

Subsection (d) of section 3 of article 5.101 authorizes insurers to impose any rate by classification within the applicable flexibility band without the prior approval of the board. The subsection further provides:

> Within 30 days of the effective date of the benchmark rate for a particular line, each insurer which proposes to write that line of insurance in the state during the effective period of the benchmark rate shall file with the board its proposed rate by line, and by classification and territory under the board-promulgated rating manual, unless the insurer has obtained approval from the board under Subsection (g)(2) of this section to use its own rating manual. The insurer shall include in the filing any statistics to support the rates to be used by the insurer as required by board rule, including information necessary to evidence that the calculation of the rate does not include disallowed expenses.

*Id.* at 935. Subsection (e) of section 3 provides that an insurer may not impose a rate outside the upper and lower limits of the flexibility band without the prior approval of the board.

Subsection (g) of section 3 requires the board by rule to adopt a rating manual, which shall be used by all insurers unless they receive approval to use their own manual pursuant to subdivision (2) of subsection (g). Subdivision (2) permits an insurer to seek board approval for its own manual, but it does not enumerate those factors that an insurer may consider in preparing such a manual and fixing such a rate. Thus, subdivision (2) does not explicitly permit or preclude the use of experience rating in formulating the manual. Therefore, we find nothing in House

Bill 2 that would preclude an insurer from considering experience ratings as a factor in formulating a manual.

Moreover, there is language in both subdivision (2) and subdivision (4) that contemplates that experience rating be employed as a factor. Subdivision (2) of subsection (g) provides in pertinent part:

> Following written application and board approval, an insurer may use a rating manual relative to classifications and territories of risks, different from that promulgated by the board, to calculate the rate used by that insurer *for an individual risk.* (Emphasis added.)

*Id.* at 254. Subdivision (4) of subsection (g) provides:

> The effect on the rate charged *an individual risk* through surcharges and discounts under any such approved rating manual shall not be greater than plus or minus 10 percent, as a deviation from the insurer's filed rate within the flexibility band or approved rate outside the flexibility band. (Emphasis added.)

*Id.* We construe the use of the phrase "individual risk" to support the argument that experience rating may be employed by insurers in formulating their own manuals and in fixing rates for premiums. Accordingly, we answer your second question in the negative; nothing in House Bill 2 acts to preclude the board from utilizing experience rating in determining the benchmark rates and flexibility bands or to preclude insurers from utilizing experience rating in formulating their manuals.

## SUMMARY

> Section 2.02 of House Bill 2, which amends article 5.01 of the code by adding a subsection (f), applies both to Lloyd's plans and to interinsurance exchanges. Nothing in House Bill 2 acts to preclude the State Board of Insurance from utilizing experience ratings in determining the benchmark rates and flexibility bands required by subchapter M of chapter 5 of the code or to pre-

clude insurers from utilizing experience rating in formulating their own manuals as permitted under subchapter M.

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY (Ret.)
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

MADELEINE B. JOHNSON
Chair, Opinion Committee

Prepared by Jim Moellinger
Assistant Attorney General